FREDDIE JESSE, appellee, v. WEMER & WEMER COMPANY et al., appellants.

No. 49091.

(Reported in 82 N.W.2d 82)

APRIL 3, 1957.

REHEARING DENIED JUNE 7, 1957.

Gilmore, Dull & Keith, of Ottumwa, and Baumert & Gerard, of Sigourney, for appellants.

Moon, Barnes & Schlegel, of Ottumwa, and Kepford, Balch & Kepford, of Waterloo, for appellee.

LARSON, J.—Plaintiff's action for damages resulted from an accident on Highway 63 about three miles north of Ottumwa, Iowa, May 22, 1951, about 6 or 6:30 p.m. Southbound plaintiff had brought his empty semitrailer truck to a stop from 40 to 75

feet north of a railroad underpass after he received a signal from the operator of a northbound semitrailer nearing the underpass indicating that he was coming through. Plaintiff, traveling about 50 miles per hour, had passed defendants' vehicle, a dual-wheeled loaded stock truck, about a mile north of the underpass, and had returned to his west lane prior to the yellow nonpassing warning line on the pavement. Plaintiff testified he first pulled away from defendants' rig, but after proceeding some 500 or 600 feet started to slow down, flash the rear running lights on his truck, and apply his brakes which activated his rear stop light. Defendant Walters said he saw the flashing lights when he was still some 150 feet behind plaintiff's truck and applied his brakes, but for some reason was unable to stop in time to avoid running into the rear of plaintiff's vehicle, which had then come to a complete stop.

From the record we learn that the pavement was 20 feet wide with a 6 or 8 inch berm, and although the pavement did not narrow under the pass, the pilings were very close to the edge of the pavement, and this gave the appearance of a narrow defile in the highway, as disclosed by the photo exhibits introduced.

Without reference to statutory obligations, the trial court gave instructions on due care, negligence, contributory negligence, etc. and refused defendants' proposed instructions relating, among other things, to statutory violation and legal excuse. The jury found for the plaintiff and fixed his damages at $12,-366.29. Defendants' motion for judgment notwithstanding the verdict and motion for a new trial were overruled and judgment entered for the jury-determined amount. Defendants assign nineteen errors, which may be considered under four propositions, i.e., Was plaintiff guilty of contributory negligence as a matter of law? Should the trial court have submitted for jury consideration certain issues as to plaintiff's negligence and given requested instructions thereon? Did the court err in admitting certain evidence as to custom and as to competent medical testimony? Was the jury verdict excessive? Further reference to the evidence appears in the opinion and of course under the rule will be considered in the light most favorable to the plaintiff.

Defendants' motion for a directed verdict made at the close of plaintiff's case, renewed at the close of all testimony, based upon grounds that plaintiff had failed to prove his freedom from contributory negligence which contributed to his injury and damage was properly denied. Their principal contentions are that plaintiff violated the obligations of a statute, section 321.354, without explanation or excuse, that he failed to keep a proper lookout, and that he failed to prove he had given the statutory warning required of one who stops upon the highway, all of which contributed directly to his injury and damage.

Defendants urge, with vigor, that both the statutes pertaining to stopping and parking on the highway and pertaining to adequate warning devices were statutory pronouncements of the requirements of due care, and that the unexcused violation here of those provisions was negligence per se, citing cases such as Kisling v. Thierman, 214 Iowa 911, 243 N.W. 552; Marts v. John, 240 Iowa 180, 35 N.W.2d 844, and others. They refer to our statement in Florke v. Peterson, 245 Iowa 1031, at 1034, 65 N.W.2d 372, 373, where we said: "We have consistently held that violation, without legal excuse, of a statute which prescribes the care required under given conditions constitutes negligence per se", citing cases.

Defendants alternately argue that if we consider the violations here no more than prima-facie negligence, the question as to whether or not plaintiff's acts were justified and were not contributory negligence should have been submitted to the jury under proper instructions as to statutory requirements and adequate excuse for failure to comply. They cite such cases as Clark v. Umbarger (1956), 247 Iowa 938, 75 N.W.2d 243; Smith v. Pust, 232 Iowa 1194, 6 N.W.2d 315; Reed v. Willison, 245 Iowa 1066, 65 N.W.2d 440; Ellis v. Robb, 242 Iowa 875, 47 N.W.2d 246; Tuhn v. Clark, 241 Iowa 441, 41 N.W.2d 13, 15 A. L. R.2d 903; and others. With the principles and enunciations set forth in these cases there can be no question here in Iowa. They are sound and correct. However, the trial court did not feel them applicable to the facts of this case, and we agree.

I. Primarily, then, the first proposition to consider is whether or not there was substantial evidence of a violation of a statutory obligation either as to stopping on the traveled por-

tion of the highway or in failing to give a signal warning required by the statutes. The trial court clearly concluded no such evidence appeared and gave instructions relating only to common-law requirements of due care. The problem thus requires consideration of the statutes involved.

Section 321.354, Code of Iowa 1954, in effect when this matter arose, provides in part: "* * * no person shall stop, park, or leave standing any vehicle * * * upon the paved * * * part of the highway when it is practical to stop, park, or so leave such vehicle off such part of said highway * * *."

Primarily, this is a parking restriction statute. Its predecessor, section 5054, Code of 1924, used this language: "No person shall, during any period of time * * * permit a motor vehicle, under his control, to *stand* upon the paved portion of any hard surfaced highway outside of the corporate limits * * *." (Emphasis supplied.)

██ ██ Clearly the word "stop" used in the statute is intended as synonymous with "park" or "leave standing." They must be read together. "Park" means to halt and to leave standing, or to stop and remain standing. See Webster's New International Dictionary, 1928 Edition. It is inconceivable that every stopping, regardless of the emergency or cause, even of a momentary nature, was intended to be prohibited by this statute, and in this regard it must be considered ambiguous as to legislative intent. Such a change from the common-law rules requiring due care under compelling circumstances such as we observe here would not meet with reason or expediency. We have often said statutory construction that would lead to unreasonable, unjust, impracticable and absurd consequences cannot be adopted. Worthington v. McDonald, 246 Iowa 466, 470, 68 N.W.2d 89, and citations; 50 Am. Jur., Statutes, sections 226, 227; Annotation 37 A. L. R. 944. Although not strictly a case in point, see discussion in Long v. Northrup, 225 Iowa 132, 279 N.W. 104, 116 A. L. R. 1475. There are far too many times when, due to road repair, narrow bridges, or other hazardous situations, due care demands that one stop his vehicle momentarily. To require the operator of such a vehicle to take to the shoulder or to explain under such circumstances why he did not

go onto the shoulder of the highway to stop, under penalty of being charged with negligence, inferred or per se, would most certainly confuse rather than clarify the obligations of a motor-vehicle operator on our highways, to say nothing of juries required to pass on legal excuses therefor. This court has said many times it is the obligation of one to stop when it becomes apparent to him another will not yield the right of way and a real or apparent hazard appears. We have said it would be negligence not to do so. See Jordan v. Schantz, 220 Iowa 1251, 1256, 264 N.W. 259.

The trial court determined, under the circumstances disclosed by the evidence, the stop made by the plaintiff did not amount to parking or standing contemplated under this statute, so as to require special instruction thereon. We concur, but in doing so also warn that there may be many instances where the question of fact as to whether a "stop" amounted to a parking prohibited by the statute should be left for the jury under proper instructions. Nevertheless we are satisfied that where one stops momentarily upon the paved portion of the highway *to yield* the traveled portion of the pavement at a narrow bridge, underpass or other defile, or in kindred circumstances, such a momentary stop itself is not a violation of the provisions of due care set forth in section 321.354 of the Code, and that the court was correct in refusing instructions relating thereto in this case. Section 321.316, Code of 1954, in contemplation of required and necessary stops on the highway, sets out a requirement of notice to following vehicle operators. This stop seemed reasonably necessary. Plaintiff testified:

"The underpass * * * looked narrow to me * * *. I believed that my truck and the one approaching me from the south could not safely pass through this underpass at the same time. * * * He (the operator of the approaching truck from the south) flashed his lights. * * * I * * * flashed my lights that I was unloaded and he could have it. * * * Immediately I started flickering my trailer lights and put my foot on the brake to come to a stop. I did not put my left arm out."

Thereafter plaintiff said he brought his truck to a casual stop "like you normally would at a stop sign." It was a momen-

tary stop to let the northbound vehicle come through the underpass, for as that truck came alongside, plaintiff said he was preparing to move forward, but at that moment he was hit from the rear by defendants' loaded truck.

Under these circumstances the issue for the jury to decide was whether as a prudent man the plaintiff's action in stopping to yield the underpass was in the exercise of due care rather than as an excuse for violating a statute, and we find no error in the court's instructions given in this regard.

II. Defendants contend that the court's instructions as to the legal requirement to give a timely and adequate signal of his intention to stop were erroneous, and that plaintiff failed to prove he had given the signal required by Code section 321.317. The trial court told the jury: "* * * it was his (plaintiff's) duty before suddenly decreasing the speed of, or stopping his truck, to give a timely and adequate signal of his intention to slow down or stop. *No particular type or manner of signal was required of him*, but he was required to give timely warning of his intentions, and such warning as would be calculated to reasonably and timely warn other travelers upon the highway * * *." (Emphasis supplied.)

Defendants contend, although this may be a proper instruction under the due care required by common law, the statutory requirements are specific and set forth obligations with which plaintiff has not shown compliance. Section 321.316, Code of Iowa 1950, then in effect provided:

"No person shall stop or suddenly decrease the speed of a vehicle without first giving an appropriate signal in the manner provided herein to the driver of any vehicle immediately to the rear when there is opportunity to give such signal."

Section 321.317 provided:

"The signals herein required may be given either by means of the hand and arm or other proper signal or signal device of a type approved by the department, * * *."

Section 321.318 designates the meaning of each arm signal required, when that method is used. No specific types of mechanical or electrical signals were here set forth, but defendants contend, because of the wording of section 321.317 it becomes

incumbent upon the plaintiff to introduce proof that the type used by him was approved by the "department", which is defined as "the motor vehicle department under the commissioner of public safety." Section 321.1(34), Code of 1950.

Section 321.404, Code of 1950, enacted subsequent to section 321.317, gives some indication of proper equipment required by statute as follows:

"Every motor vehicle shall be equipped with a signal lamp or signal device which is so constructed and located on the vehicle as to give a signal of intention to stop, which shall be red or yellow in color, which signal shall be plainly visible and understandable in normal sunlight and at night from a distance of one hundred feet to the rear but shall not project a glaring or dazzling light."

█ It would not be an unfair assumption, considering these statutes both effective, that any signal device which conforms to the latter standard would have the approval of the department. It would appear that the trial court's instruction that "no particular type or manner of signal was required * * *" is too broad. However, as pointed out, the record discloses that defendant Walters saw and understood the warning signals given by plaintiff while some 150 feet away, and that plaintiff's stop light was on after the collision. The type of warning under these facts seems quite immaterial and clearly has no bearing on a proximate cause of the collision, injury or damage. Jirkovsky v. Elfman, 323 Ill. App. 282, 55 N.E.2d 288; Ryan v. Trenkle, 203 Iowa 443, 212 N.W. 888; Scoville v. Clear Lake Bakery, 213 Iowa 534, 239 N.W. 110. Furthermore, plaintiff testified defendant operator said he pumped his brakes, but they would not hold. These being the facts, no causal connection would appear due to the failure of plaintiff to signal with an approved mechanical or electrical device, and that error, if it was error, in the instruction would not be prejudicial. Jirkovsky v. Elfman, supra; Ryan v. Trenkle, supra.

In Scoville v. Clear Lake Bakery, supra, at page 539 of 213 Iowa, page 112 of 239 N.W., we said: "The only function to be served by lights, or by an attendant, would be to warn travelers of the presence of the obstruction in the road. Such

ground of negligence could not be available to a plaintiff who saw the truck for hundreds of feet in his approach thereto, and had no need of further warning."

Also see Schroeder v. Kindschuh, 229 Iowa 590, 595, 294 N.W. 784; Harvey v. Knowles Storage & Moving Co., 215 Iowa 35, 41, 244 N.W. 660.

III. As a further ground for their contention that the court should have directed a verdict for them, defendants claim plaintiff failed to show he maintained a proper lookout. A proper lookout is a common-law duty placed upon everyone operating a motor vehicle upon the highways of this state. This duty, under the best authorities and most sound reasoning, requires a lookout not only to the front and sides but also to the rear, with the question as to its being a proper or sufficient lookout determined by the particular surrounding circumstances as revealed by the evidence then under consideration. Clayton v. McIlrath, 241 Iowa 1162, 1170, 44 N.W.2d 741, 27 A. L. R.2d 307; Brewer v. Johnson, 247 Iowa 483, 72 N.W.2d 556. When the circumstances require, in the exercise of prudence and ordinary care, a lookout to the rear, proper lookout requires watchfulness and care for the safety of others. Ehrhardt v. Ruan Transport Corp., 245 Iowa 193, 61 N.W.2d 696; Becker v. City of Waterloo, 245 Iowa 666, 63 N.W.2d 919.

Usually prudence and ordinary care require concentration ahead rather than behind. In the face of just such a circumstance as we have here, plaintiff's attention and obligation to see and meet the situation that was before him was of course paramount.

Considering this problem in an early case of Strever v. Woodard, 160 Iowa 332, 337, 141 N.W. 931, 933, 46 L. R. A., N. S., 644, we said: "Nor are we content with the suggestion of an obligation on the part of a traveler that he must, Janus-like, keep an outlook in the rear * * *."

In Delfs v. Dunshee, 143 Iowa 381, 389, 122 N.W. 236, 240, we said under the circumstances there related: "* * * Nor was he bound to *keep* a lookout backwards. He had the right to rely upon those approaching from the rear to do so in the exercise of ordinary care." (Emphasis supplied.) See also Lawson v. Fordyce, 234 Iowa 632, 12 N.W.2d 301.

Also see 1 Blashfield's Cyclopedia of Automobile Law and Practice, Permanent Ed., section 685, where the author says: "The duty of a driver to look ahead is paramount, though he must use reasonable care to ascertain whether cars are coming from behind if intending to change his course * * *."

At pages 743 and 744, section 322, 60 C. J. S., Motor Vehicles, the general rule is said to be "* * * where vehicles are traveling in the same direction, the precise duties of the operator of the vehicle ahead depend on the circumstances. Some decisions hold that the leading vehicle has no absolute legal position superior to that of the one following, but that the operator must exercise ordinary care under the circumstances to prevent injury to vehicles that may be following, as by the use of necessary lights or warning signals on the rear of the vehicle to give notice to overtaking traffic. [Citing LeSage v. Smith, Tex. Civ. App., 145 S.W.2d 308; Valdin v. Holteen (1953), 199 Ore. 134, 260 P.2d 504.] Other decisions, however, have broadly held that the vehicle ahead has the superior right, and that the driver thereof ordinarily owes no duty to the following car except to use the road in the usual way, in accordance with the laws of the road. It has been held that the driver in the lead need not as a rule keep a vigilant watch for drivers trailing him, although it has also been held that he cannot entirely ignore vehicles in the rear, and that he may be required to keep a lookout for vehicles to the rear where there appears some particular fact that calls his attention to the following vehicle and imposes some duty on the motorist to maintain such a lookout, *or where he intends to execute some maneuver requiring a lookout for, and signal to, the following vehicle* * * *." (Emphasis supplied.) (Citing LeSage v. Smith, supra.)

In 5 Am. Jur., Automobiles, section 280, page 656, there appears: "The driver of the front car owes no duty to the rear or trailing car except to use the road in the usual way, in keeping with the laws of the road, and until he has been made aware of it, by signal or otherwise, he has a right to assume either that there is no other automobile in close proximity to his rear or that, being there, it is under such control as not to interfere with his free use of the road in front of and to the side of him in any lawful manner."

In referring to the term "lookout" in the recent case of Devore v. Schaffer, 245 Iowa 1017, 1024, 65 N.W.2d 553, 557, we said: Lookout is a "duty of keeping watch for possible danger. * * * As used in connection with the operation of a motor vehicle it has no technical legal significance. Its meaning depends on the context." As applied therein, it was held to mean care to discover whether plaintiff was in a place of safety from possible injury by the contemplated movement of the truck and trailer. We said in Ehrhardt v. Ruan Transport Corp., supra, 245 Iowa 193, 199, 61 N.W.2d 696, lookout by a motorist means more than looking straight ahead.

Of course, maintenance of a proper lookout means doing something more than mere looking, i. e., the acts required by a diligent person exercising due care when the lookout discloses or reasonably should disclose to the driver circumstances fraught with danger. It does no good to look unless the action to avoid injury is reasonably prudent. For example, such acts require the giving of a proper signal to apprize the driver of the car in the rear of one's intentions in the operation of his vehicle. Under the circumstances related here no other act was required, and it would appear to call for mere speculation to submit to the jury the question of whether the plaintiff should have done something else to maintain a proper lookout.

In the recent case of Clayton v. McIlrath, supra, 241 Iowa 1162, 44 N.W.2d 741, 27 A. L. R.2d 307, the plaintiffs' automobile was overtaking and passing defendant's car just as defendant turned out into the left lane of traffic, resulting in a collision. We said at page 1170: "* * * a motorist who is about to turn to his left to pass a preceding vehicle is required to exercise ordinary care under the circumstances to keep a lookout for other vehicles which may be in the act of passing him or otherwise be endangered by such movement." In such a situation lookout would include a look to the rear before a change of direction is attempted, and if danger appears, the additional duty to delay the maneuver is manifest. Such additional duty may also apply when pulling back into one's right-hand lane immediately after passing another vehicle. Section 321.299, Code of 1954. But the evidence here was undisputed that plain-

tiff had already passed defendant Walters and was well in front of him in the west or proper lane of traffic even prior to his slowing down for the stop. Obviously here no duty to delay this movement was violated. We are also certain plaintiff was not negligent in assuming that those behind him would observe the laws of the road, statutory or by common-law custom, and not follow so closely that they would be unable to stop, after due, timely and adequate warning. Menke v. Peterschmidt, 246 Iowa 722, 728, 69 N.W.2d 65, and cases cited.

Assuming, then, such a stop on the highway ordinarily would require one to keep a lookout for vehicles to his rear, yet the evidence without dispute discloses plaintiff gave appropriate warning signals which were seen and understood by the operator of the following vehicle while still some 150 feet behind him. It was, as found by the jury, under proper instructions, a "proper and timely" warning on the part of the plaintiff, and that it was the defendant's failure to stop which was the proximate cause of the collision. We find, then, no other duty upon plaintiff, the violation of which contributed to the injury.

■■ We conclude that the duty of lookout to the rear does not require constant attention at all times, but only sufficient observation to establish an awareness of the presence of others at a time when a maneuver is contemplated which may endanger the following vehicle. This duty includes the giving of an appropriate, adequate and timely warning to the persons in the rear. As stated, the undisputed evidence discloses plaintiff was aware of defendant's presence and gave the warning which, under the issues submitted to it by the court, the jury found was *adequate* and *timely*. Proper lookout to the rear required no more under the circumstances, and there was no error in failure to instruct thereon. True, there was a shoulder on the approach to the underpass, but at or near the place of stopping, as disclosed by the picture exhibits, it was sloping, rough and funnel-shaped up to the pass itself. Negligence could scarely be predicated upon the failure of plaintiff to take to the shoulder here, as a violation of the duty to keep a lookout to the rear. No authority has been cited to require such acts, in addition to an adequate warning, to comply with the obligation to maintain a lookout to the rear, and we think there are none. It

is clear any lookout plaintiff failed to maintain, therefore, did not contribute directly to the collision, and the court's failure to instruct on lookout to the rear, even if proper, was not prejudicial error. Brewer v. Johnson, supra, 247 Iowa 483, 72 N.W.2d 556.

■ IV. Defendants' counterclaim alleges that plaintiff abruptly and negligently brought his truck to a stop without giving adequate warning or signal of his intention to do so. While the reference to an *emergency* was made and defendants contend the evidence of such is only proper to excuse an act of negligence on the part of plaintiff, we find in that evidence, which the court properly explained to the jury, only testimony which justified the judgment of plaintiff in not proceeding into a dangerous or apparent dangerous situation, rather than an excuse for a negligent act. It was rather justification for his acts to avoid negligence by proceeding. In this connection defendants complain of testimony admitted as to a *custom* of truckers to give certain signals when such a narrow impass is approached by meeting vehicles. The trial court told the jury: "* * * this line of testimony * * * is being admitted and may be considered by you and given such weight as you deem it entitled to have, as bearing upon the state of mind * * * of the plaintiff, just prior to his stopping and his reason for stopping, as bearing upon the question of his contributory negligence, if any, in stopping the truck at the time and place in question. This evidence may be considered by you for that purpose only."

The statement was correct. The signals given and received were properly received as the basis of plaintiff's understanding of the danger then and there existing. This evidence did no more than justify his decision as a reasonably prudent person under the circumstances, as they were observed and reasonably understood by him. By knowledge of the custom he understood the signal meant the other truck was coming on through the pass, and he could *yield or try* the defile at the same time. He had a right to his one half the traveled portion of the highway under the pass, but the modern "boot hill" is filled with those who made similar tries, upon whose headstones could be written:

"Here lies the body of John O'Day
He died maintaining his right of way,
He was right, dead right, so he drove along,
But he's just as dead as though he'd been wrong."

The jury felt his discretion proper, and so do we. Langner v. Caviness, 238 Iowa 774, 778, 28 N.W.2d 421, 423, 172 A. L. R. 1135, and authorities cited therein. We held there that subject to certain qualifications upon the issues of negligence and contributory negligence, evidence of custom in the performance of similar acts, while not conclusive, is generally admissible. We said: "Conformity with custom is some proof of due care and nonconformity some proof of negligence", citing cases. Also see 38 Am. Jur., Negligence, section 267; 25 C. J. S., Customs and Usages, section 32.

V. We come now to the contention by defendants that testimony of Doctors Diamond and Fox was erroneously admitted, over proper and timely objections. The testimony of Doctor Diamond was by deposition. He testified he was the attending physician, and relied in part upon the history the plaintiff gave him. He first saw plaintiff on May 1, 1953, almost two years after the accident. He next saw the patient on May 18, 1953, and had not seen him since. Under his prescription plaintiff took about ten physiotherapy treatments, administered by the registered therapist in Doctor Diamond's office. The doctor's findings were that plaintiff had a chronic back sprain and he also prescribed a corset or back brace, which the plaintiff purchased and wore. Doctor Diamond said plaintiff suffered partial permanent disability of about ten per cent. It was his opinion that the injury produced a condition of the lumbar spine which was permanent in nature. His charges were $47. It appeared this action had already been commenced at the time this professional service was rendered, although both the plaintiff and the doctor denied the purpose of the consultation was to produce testimony in the case or that the doctor knew of the pending action when his services were first obtained. There was no testimony to the contrary.

Defendants contend the evidence was not clear that Doctor Diamond was "a good faith treating physician" so as to justify

his testimony. They contend the question as to whether or not he was a treating physician should have been submitted to the jury. We do not agree, for such objection is addressed to the competency of the testimony as well as the doctor, and was for the court to decide. There was no error in that determination, for the mere fact that an action had been commenced would not disqualify any physician who substantial evidence discloses was retained to actually diagnose, treat and prescribe for the litigant. The hearsay and self-serving restriction, we think, should extend no further than to objectionable testimony of one retained solely for the purpose of testifying in the case as an expert witness.

Doctor Fox admittedly was called as a medical expert and had examined plaintiff with the purpose of offering testimony in this trial. Immediately after qualification, defendants' counsel examined him as to the source of the knowledge from which he expected to testify and objected to admission of his testimony as being based upon hearsay and self-serving information. Both parties cite and rely upon our recent pronouncements in Devore v. Schaffer, 245 Iowa 1017, 65 N.W.2d 553. We held therein a medical expert who has examined a plaintiff for the sole purpose of qualifying as an expert witness must base his testimony solely on the examination, and statements made to him by the patient as to the accident and the resulting injuries received cannot be related to the jury or form part of the basis of the expert's opinion. Devore v. Schaffer, supra, and cases cited therein. This court there divided as to the acceptance of any expert opinion based upon the "clinical history", even though the history was not admitted as substantive proof.

In the case at bar Doctor Fox was asked to base his opinion of the plaintiff's physical condition solely upon his physical examination of the plaintiff, and the answer was limited by the doctor himself to plaintiff's present condition. Defendants contend, having received a "case history" from the patient, an examining physician cannot give an opinion as to disability based solely on his own examination. We cannot say as a matter of law that is so, and believe it better to let the jury pass on the truth of that contention. The jury is best able to give his testimony the weight they feel it deserves. Doctor Fox's

opinion as to the plaintiff's present condition was based on the patient's reactions to manual manipulations and tests he conducted. Of course this involved statements of plaintiff as to pain, etc., for as the doctor said, pain cannot be seen. Doctor Fox stated: "Without the use of a history, without the use of an X-ray examination, I can arrive at a conclusion that the patient has a certain disability. I cannot arrive at a conclusion of permanency without the other aids. * * * As a result of the physical examination I would estimate that that man was not capable of doing heavy activity." Doctor Fox did not give any opinion on the percentage involved.

As to the settled law on the admissibility of expert medical testimony based upon case history, we can add little to our holdings in Devore v. Schaffer, supra; Mitchell v. Montgomery Ward & Co., 226 Iowa 956, 285 N.W. 187; Pierce v. Heusinkveld, 234 Iowa 1348, 14 N.W.2d 275; Little v. Maxwell, 183 Iowa 164, 166 N.W. 760.

In 20 Am. Jur., Evidence, section 866, it is stated: "The general rule is that the opinion of a physician * * * as to the condition of an injured or diseased person, *based wholly or in part on the history of the case* as related to the physician * * * in the course of an examination of the former made out of court for the purpose of qualifying the physician * * * to testify as a medical expert, is not admissible, even though the injured * * * person testifies that the statements he made to the physician are true." (Emphasis supplied.)

In 32 C. J. S., Evidence, section 536, page 259, good authority is cited that a medical expert who has examined the patient for the purpose of becoming a witness "must base his testimony solely on the examination * * * and not on statements in the nature of self-serving declarations made by the patient * * * and acts * * * which may have been either voluntary or involuntary, cannot form part of the basis of the opinion."

It is worthy of note that no evidence to rebut plaintiff's claimed injury was produced by defendants. Plaintiff and Doctor Diamond had related the facts claimed in the case history. The basis of Doctor Fox's limited opinion was, by competent evidence, already before the court, and to that extent was

cumulative. We do not therefore consider it prejudicial error to admit his testimony, even though Doctor Fox was familiar with the history and did rely somewhat on statements made by plaintiff in the process of examination. The trial court very carefully restricted the doctor's testimony so as to avoid, we think, the objectionable evidence within the hearsay and self-serving prohibition. We conclude the opinion of Doctor Fox as to the present physical condition of the plaintiff, wherein he did not consider history or X rays in his expressed opinion on disability, resulted in no reversible error.

VI. Defendants offered twenty-two instructions and objected to the correctness or sufficiency of many of the instructions given by the court. These offered instructions dealt with the matters heretofore discussed and, without extending this opinion unduly by discussing each, it is sufficient to say we are content with the trial court's instructions and find in them no prejudicial error. Upon issues raised by defendants' counterclaim, the requested instructions largely refer to contentions pertaining to plaintiff's alleged negligence.

The jury found for the plaintiff. In so doing, it found that the defendant Walters was negligent and that his negligence was the proximate cause of the collision. It found that plaintiff was free from contributory negligence. Therefore, as we have often said, if it was error for the court to have refused to submit any of the grounds referred to in instructions offered as to plaintiff's negligence, it was harmless error because the findings of the jury are fatal to defendants' counterclaim. Refusal to submit such issues was, therefore, not reversible error. Fagen Elevator v. Pfiester, 244 Iowa 633, 636, 637, 56 N.W.2d 577, and cases cited therein.

VII. Finally we consider defendants' motion for a new trial based on the ground that the award was so excessive that it appeared to have been influenced by passion and prejudice. This is always a troublesome question for the appellate court. We have often said we rely greatly upon the judgment of the learned trial court, which is in a better position than we to decide such an issue. We are left to the cold record to decide whether or not the jury verdict went beyond the reasonable limits of the facts disclosed by the evidence. Each case, of

course, must be determined by the pertinent facts disclosed by competent evidence. Jettre v. Healy, 245 Iowa 294, 60 N.W.2d 541, and cases cited therein; Hackman v. Beckwith, 245 Iowa 791, 64 N.W.2d 275; Stein v. Sharpe, 229 Iowa 812, 295 N.W. 155; Elings v. Ted McGrevey, Inc., 243 Iowa 815, 821, 822, 53 N.W.2d 882, and citations. For a rather complete discussion of this subject, see Henrich v. Oppedal (March, 1957), 248 Iowa 509, 81 N.W.2d 429. Plaintiff's claim, for personal injuries in the collision which caused but $76.27 damage to his vehicle, was based on a back injury which the treating doctor said gave him a ten per cent permanent disability. Plaintiff testified he had been to various doctors and taken various treatments, but showed only $47 actual medical expense. He had lost considerable time and had taken lighter work for a while which did not bring him his usual income of about $400 per month or a sixty per cent take from loads pulled by his tractor. No amount or value was given as to the lost time, although in a different part-time occupation in 1953 he only earned $700. He testified his earnings, when he returned to truck driving, were curtailed, for he could not drive routes requiring driver handling of the heavy cargo, such as freight-peddling runs. He was forced to refuse such trips because of pains and faintness when he attempted to lift heavy objects.

We find much merit in defendants' contention that there is a failure of clear and satisfactory proof as to the extent of the losses or damages suffered by plaintiff. Because of·a permanent injury and the nature of his work, we could expect some reduction in his earning capacity. This actual reduction was not made clear, if at all. He suffered pain and lost time, which was to some extent related. The evidence as to his total medical expense is lacking, and we are far from satisfied the record taken as a whole supports the liberal allowance made by the jury. As we said in Soreide v. Vilas & Co., 247 Iowa 1139, 1154, 78 N.W.2d 41, 50, and Booth v. General Mills, Inc., 243 Iowa 206, 210, 49 N.W.2d 561, the award in such cases is necessarily somewhat of an approximation and much must be left to the good judgment of the jury, but here we are convinced the verdict of $12,366.29 is not warranted by the evidence. Any sum in excess of $7500 must be held to be excessive.

If, therefore, within thirty days from the filing of this opinion plaintiff shall remit all of the judgment in excess of $7500 with interest and costs, the judgment will be affirmed, otherwise reversed and remanded for a new trial.—Affirmed on condition.

WENNERSTRUM, HAYS and PETERSON, JJ., concur.

SMITH, J., concurs in result.

THOMPSON, J., dissents.

BLISS, C. J., and GARFIELD and OLIVER, JJ., join in the dissent.

THOMPSON, J. (dissenting)—Divisions I and III of the majority opinion seem to me to be unsound in reasoning and erroneous in the conclusions reached. I am constrained to dissent therefrom.

I. Division I of the majority opinion holds that the trial court did not commit error in failing to instruct on section 321.354, Code of 1950, which was in effect at the time of the collision. It must be kept in mind that the plaintiff stopped his truck on the pavement; there is no dispute as to this. There is also substantial evidence that at the point where he stopped and for some distance ahead and back thereof there was a shoulder ten feet wide upon which he could have pulled his vehicle before stopping. Since the majority opinion omits some parts of section 321.354 which may have a bearing upon the question at issue, I set it out again more fully:

"321.354 Stopping on traveled way. Upon any highway outside of a business or residence district no person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the paved or improved or main traveled part of the highway when it is practical to stop, park, or so leave such vehicle off such part of said highway, but in every event a clear and unobstructed width of at least twenty feet of such part of the highway opposite such standing vehicle shall be left for the free passage of other vehicles and a clear view of such stopped vehicle [shall] be available from a distance of two hundred feet in each direction upon such highway * * *."

While it may not be material, I desire to correct the record made by the majority when it refers to the "predecessor" of section 321.354, designated as section 5054 of the Code of 1924. A part of this section is quoted; but very material parts are omitted, giving a much too inclusive meaning to the statute. The important omission from section 5054 as quoted follows the words "during any period of time". The statute follows this with "for one-half hour after sunset to one-half hour before sunrise." This section was limited to the hours set out. It did not apply to vehicles upon the highways during the daylight hours, and so far as the case at bar is concerned was in no sense a predecessor to section 321.354. Section 321.354 had no predecessor in our statute law for daytime hours, during which the accident with which we are here concerned happened.

The important part of section 321.354 is the words "stop, park, or leave standing." The majority says: "Primarily, this is a parking restriction statute." Then comes the erroneous reference to and partial quote from section 5054, Code of 1924, and then this language: "Clearly the word 'stop' used in the statute is intended as synonymous with 'park' or 'leave standing'." It is at this point that I part company with the majority. It may be true that the word "park" includes stopping; but as the majority points out, there is more included in "parking" than merely stopping. If the statute is merely a parking statute, if "stop" is synonymous with "park" or "leave standing", why is the word "stop" included?

The rule of statutory construction is that meaning must be given to every word in the act, and that the legislature understood the meaning of the words it used and intended them all to have effect. 82 C. J. S., Statutes, section 316(b); 50 Am. Jur., Statutes, section 358. That construction is favored which will render every word operative, rather than one which eliminates some words, or makes them merely repetitious and of no effect. 50 Am. Jur., Statutes, section 358, supra. We ourselves have said that a construction making certain words in a statute redundant and useless will be avoided; it will not be presumed the legislature intended such a result. A statute should be interpreted, if possible, to give effect to all of the language used.

Hartz v. Truckenmiller, 228 Iowa 819, 824, 293 N.W. 568, 571. We have also said that in construing a statute all the language is to be considered. Rohlf v. Kasemeier, 140 Iowa 182, 185, 186, 118 N.W. 276, 277, 23 L. R. A., N. S., 1284, 132 Am. St. Rep. 261, 17 Ann. Cas. 750.

By what logic the majority avoids giving the word "stop" its usual meaning, as distinguished from "park" or "leave standing" is not clear to me, after considerable study of the opinion. It seems evident that the legislature had something in mind in using it. It intended to prohibit something more than halting and leaving standing, or stopping and remaining standing. Other courts have had no difficulty in reaching the conclusion that "stop" in similar statutes was put there for a definite purpose. It adds a restriction which would not be present if the statute meant nothing more than "park or leave standing." In Neeley v. Bock, 184 Wash. 135, 50 P.2d 524, 526, there is found this definition from 3 Berry on Automobiles, 7th Ed., page 130:

" 'Parking' within the meaning of regulatory statutes has been defined as the 'voluntary act of leaving a car on the highway when not in use'; another court has stated that 'to park' is 'to permit a vehicle to remain standing on a public highway or street.'

"It has been held that parking means something more than stopping temporarily or momentarily for a necessary purpose."

The question was again before the Washington Supreme Court, in Sandona v. City of Cle Elum, 37 Wash.2d 831, 838, 226 P.2d 889, 893. The case involved the construction of a city ordinance which contained the words " 'stop, stand or park.' " In answer to the contention that this was merely a parking ordinance and so did not apply to the standing of vehicles while they are being loaded or unloaded, the court said: "In the case at bar, we are concerned with the meaning of the words 'stop, stand or park', which are more definite and comprehensive than the phrase 'park or leave standing'. The case cited is not here in point." It was also said in the same case (page 837 of 37 Wash.2d, page 893 of 226 P.2d):

"Appellants cite authorities to the effect that statutes or ordinances governing the parking of motor vehicles, which forbid parking or standing, do not prohibit commercial loading or unloading. These cases are not in point, as the ordinance in question forbids any person to 'stop, stand or park a motor vehicle' within the prohibited area."

In Gaches v. Daw, 168 Wash. 162, 10 P.2d 1111, 1114, where it appeared that the defendants had stopped their car on the highway to look at a direction sign and their automobile was struck by the plaintiff, the court approved an instruction which told the jury that if they stopped the car on the paved portion of the road when it was practicable for them to drive it off the highway, they would be negligent.

The Indiana Supreme Court went into the matter at some length in Northern Indiana Transit, Inc., v. Burk, 228 Ind. 162, 168, 89 N.E.2d 905, 907, 908, 17 A. L. R.2d 572. The material part of the statute involved is quoted: " '* * * every vehicle stopped or parked upon a roadway where there is an adjacent curb shall be so stopped or parked with the right-hand wheels of such vehicle parallel with and within twelve [12] inches of the right-hand curb.' "

A bus owned and operated by the appellant, transit company, had stopped at about a thirty-degree angle with the curb to take on passengers, and was struck by an automobile. The appellee was a passenger in the bus and was injured in the collision.

The Indiana Supreme Court (pages 169, 170 of 228 Ind.) used this cogent language in pointing out the distinction between stopping and parking:

"There is a distinction between parking and stopping a motor vehicle. Webster's New International Dictionary (2d Ed.) defines the term 'stop' to mean, 'A cessation of motion, operation, progress, function, or the like.' Parking includes stopping, but stopping does not necessarily result in parking. A leading case on the question of parking has defined the term as follows: '* * * The term "parking", as applied to automobiles and automobile traffic, has a well-defined meaning, understood by all automobile drivers to mean not only the voluntary

act of leaving a car on the street unattended but also the stopping of a car on the highway though occupied and attended for a length of time inconsistent with the reasonable use of a street, considering the primary purpose for which streets exist. Streets exist primarily for the purpose of travel.'

"* * * The uniform act has been carefully prepared, and it is difficult to presume the draftsmen were careless in the use of language, or that in the many places where the word 'stop' is used, it means not only stop but also parking, for parking under any possible definition includes stopping. Under appellant's contention the term 'stop' would be mere surplusage in the act. Moreover, the dangers to the traveling public from stopping in an unreasonable manner may be just as serious as stopping a sufficient length of time to become parking."

These authorities fully answer the majority position that our statute, section 321.354, supra, is no more than a parking statute and that the word "stop" therein is merely a synonym for "park" or "park or leave standing." In fact, from the standpoint of common sense and logic, no authority should be needed to demonstrate that the legislature had a definite purpose in using the word "stop." The majority would eliminate it altogether. I cannot presume the legislature meant that it would have no meaning. The statute is worded in the disjunctive—that is, it reads "stop, park, *or* leave standing." (Italics supplied.) When possible, every word should be given meaning and force.

The majority cites authorities to the effect that we should adopt that construction of the statute which will not entail unjust, unreasonable or absurd consequences. I do not disagree with this rule. But I do not find it applicable. On the other hand, I think the word "stop" was inserted in the statute for the purpose of preventing the exact danger which contributed to the collision here. In considering whether an instruction should have been given as to section 321.354 we must turn to the record to discover whether there was evidence which made it material. The defendant Walters, driver of the Wemer truck, testified that his brakes were working well; that he saw a light on the rear of the Jesse truck flash once, but did not see any

stop light or any other stop sign given. He says: "The plaintiff in this case made a quick stop. It was not a slow, careful stop. I would say it was an abrupt stop." He also denies that a northbound truck passed them at or about the time of the collision.

The jury might have found, therefore, that after passing the Wemer truck the Jesse truck made an abrupt stop, without giving a stop signal. The majority apprehends that if we hold the statute means what it says, that is, that a "stop" as distinguished from a "parking" or a "leaving standing" is prohibited, we will invite endless unpleasant consequences. It points out that there are many times when, "due to road repair, narrow bridges, or other hazardous situations, due care demands that one stop his vehicle momentarily." It reasons that we should not adopt an interpretation of the law that would require a vehicle stopping under such circumstances to drive off the traveled portion of the highway or to explain in court why he did not do so. The ready answer to this contention is that we are not here concerned with such a situation. It may be that there are times when the lack of practicality is so apparent that a trial court would be justified in refusing to instruct on the statute. But we have no such condition here. We can cross those bridges when we reach them. There is substantial evidence that the driver of the Jesse truck had just passed the Wemer vehicle; that he gave no signal of his intention to stop, but made "an abrupt stop"; and that there was ample room and adequate facilities on the shoulder for him to pull off the paved portion of the highway. If we assume, as I have no doubt we must, that the word "stop" was inserted deliberately and for a purpose in the statute, and that it was intended to cover situations where the stop was intended to be only very brief, not long enough to become a parking within the meaning of that word, it is difficult to conceive of circumstances which require its application more than in the case before us. It is not a question of whether it is convenient for the driver intending to make only a "stop" to leave the traveled portion of the roadway. Generally it will not be convenient. But we cannot say that excuses him. On this point the Wisconsin Supreme Court has said:

"Under that provision, the parking, stopping, or leaving of

a vehicle on the roadway of a highway, outside of a business or residence district, is prohibited whenever it is practical to park, stop, or leave such vehicle standing off such roadway. As the only issue in that respect, under that provision, is whether it was practical to park, stop, or leave the grader stand off the roadway, the mere fact that it may have been inconvenient or less advantageous, in point of saving time, or otherwise, to move the vehicle off the roadway, affords no excuse for failing to avoid a condition which obviously was considered such a source of danger to the traveling public that it was expressly prohibited by that safety statute. The necessity for avoiding such a menace is emphasized by the fact that it is further provided in section 85.19(1), Stats., that even when it is not practical to park, stop, or leave a vehicle off of such roadway, it shall nevertheless in no event be parked, stopped, or left upon any highway, 'unless a clear and unobstructed width of no less than fifteen feet upon the roadway of such highway opposite such standing vehicle shall be left for the free passage of other vehicles thereon, nor unless a clear view of such vehicle may be obtained from a distance of two hundred feet in each direction along such highway.'" Kassela v. Hoseth, 217 Wis. 115, 119, 258 N.W. 340, 342.

The Wisconsin statute, set out in the opinion, is substantially the same as our section 321.354; and it should be noted that attention is called to the provision that an unobstructed width of fifteen feet (in our statute it is twenty) must be left opposite the stopped vehicle, and it is thought that this emphasizes the purpose of the statute.

In Gaches v. Daw, supra, the defendants had stopped their car on the highway near an intersection, to determine which fork of the highway to take to reach their desired destination, when the plaintiff's vehicle, approaching from the rear, collided with it. The Washington statute is similar to ours. The Washington Supreme Court approved an instruction (page 169 of 168 Wash.) which told the jury that if the defendants "*stopped* their car on the paved portion of the highway, when it was practicable to leave [it] standing off the highway, then they

were guilty of negligence"; and further that if they *stopped* their automobile on the highway without leaving "a clear and unobstructed width of not less than sixteen feet" of the main traveled portion of the highway opposite their car, they would be guilty of negligence as a matter of law. (Italics supplied.) In Northern Indiana Transit, Inc., v. Burk, supra, the stop was only momentary, to take on passengers; but the statute was held to apply.

We ourselves have said that there was a jury question on the negligence of a driver who stopped his car on the highway at night, to remove ice from the windshield so that he could see, weather conditions having so encrusted the glass that visibility was destroyed. We cited several cases from other jurisdictions· which hold that a car is not disabled within the meaning of a statute such as our section 321.355, which excuses a stop under such circumstances. The holding was that this does not amount to a disability of the vehicle within the meaning of the last-cited section, and there was a jury question upon the issue of the negligence of the driver who stopped without leaving the pavement. The evidence as stated in the opinion was that the driver knew he was stopping on the pavement, but could not see the shoulder. Tuhn v. Clark, 241 Iowa 441, 442, 443, 444, 41 N.W.2d 13, 14, 15, 15 A. L. R.2d 903. Surely the situation of the driver of the defendant's car in the cited case was much more difficult than was the plaintiff's in the case at bar. Jesse was driving in bright daylight, on a dry pavement, with knowledge that another truck was not far behind, and there is substantial evidence he had a broad shoulder on his right hand upon which he could have driven with no · more than some slight inconvenience.

The plaintiff-appellee cites and relies upon Winter v. Davis, 217 Iowa 424; 251 N.W. 770. This is another case of an ice-obscured windshield. The exact holding was that the question of the negligence of the plaintiff, who had stopped his car partly on the pavement to clear his windshield, was for the jury. That is the identical point I seek to make in the case at bar. However, the case has little relevance here in any event, since it was decided before the enactment of section 321.354. Section 5054, Code of 1924, then in effect, prohibited permitting unlighted

vehicles to *stand* upon the traveled part of the highway from one-half hour after sunset until one-half hour before sunrise. (Italics supplied.) "Stop", and for that matter "park", was not a part of the statute at that time. The case is not referred to in Tuhn v. Clark, supra; no doubt because of the change in the statute and because in any event the holding goes no further than that there was a jury question on the matter of the plaintiff's negligence.

As the defendants point out and the majority agrees, violation without legal excuse of a statute which prescribes certain standards of care is negligence per se. But I do not contend that the situation in the instant case shows such violation, so that a peremptory verdict for the defendants was required. The statute itself is elastic, to the extent that it must be found that it was "practical" to "stop, park, or leave standing" the vehicle in question off the traveled part of the highway. But surely the jury should have been instructed upon section 321.354, and told that if they found it was practical to stop off the traveled portion of the roadway and the driver did not do so, he was guilty of negligence. Failure to do so was reversible error.

II. I am equally unable to agree with my learned colleagues of the majority that no prejudicial error was committed by the trial court's refusal to instruct upon the duty to keep an adequate lookout to the rear. I must first part company with them because I am unable to understand from the lengthy dissertation in the majority opinion exactly what it decides or what the true rule is thought to be. I fear only confusion will result in the mind of the trial court or the practicing lawyer who attempts to say what we have decided. I see no reason why we should not adhere to the rule laid down in Clayton v. McIlrath, 241 Iowa 1162, 1170, 44 N.W.2d 741, 27 A. L. R.2d 307. It is succinct and what it says is not left in doubt. I think there is a definite duty to keep a lookout to the rear, as expressed in Code section 321.437, which requires that every motor vehicle shall be equipped with a rear-vision mirror, so located as to give a view of the highway to the rear for a distance of at least two hundred feet. If there is no duty to keep a lookout to the rear, the purpose of this statute is obscure. The true rule, I believe, is that

a driver of a motor vehicle on the public highways is at all times required to use ordinary care under the circumstances to keep a lookout, to the rear as well as in front, and to the side for vehicles which may be in the act of passing. I do not think we should say that the duty to keep a lookout in front is paramount to the duty to look to the rear. Under all circumstances, the duty is that of using ordinary care to keep a lookout, whether to the front, the rear or the side.

However, since the majority ends with the determination that there is some duty to keep a lookout to the rear, my major disagreement with Division III of the opinion is that it concludes with a holding that, although there may be a duty to keep a lookout to the rear to some unspecified extent, the court did not commit reversible error here because the plaintiff-driver did all that he could have done if such lookout had been kept. This proceeds upon an assumption of facts not justified by the record.

I do not find the "undisputed evidence" to which the majority refers, that the plaintiff "gave warning signals which were seen and understood by the operator of the following vehicle while still some 150 feet behind him." I do not so read the record. I have pointed out above, in Division I of this dissent, a part of the defendant driver's testimony on this point. To give it somewhat more in detail, he said that he saw a light blink on the Jesse trailer: "They were corner lights and a cluster of lights and they are located on the lower part of the trailer. They are not what you call stop lights. They are those running lights on the trailer. I saw them flash once. * * * At or about that time I did not see any stop light on the other vehicle come on. I didn't see a stop light on the other vehicle until after the accident." Surely this made a jury question as to whether a warning signal was given which was seen and understood by the driver of the following vehicle. If this is so, the basis upon which the majority places its holding that failure to instruct on the duty to keep a lookout was nonprejudicial is destroyed.

Nor am I able to agree that failure to give an instruction on lookout was without prejudice, even if the record had been as the majority says it is. There were other things that the plaintiff-driver might have done, in addition to giving warning

signals of his intention to stop. If he had been keeping a proper lookout, he might have decided to keep in motion instead of stopping; he might have made a gradual instead of an abrupt stop; he might, under his own testimony, have started again before the collision occurred; or he might even have obeyed the mandate of section 321.354 and pulled his vehicle to the shoulder at the side of the road. It must be kept in mind there is substantial evidence, as pointed out in Division I above, that the plaintiff made a sudden stop; an "abrupt stop" is the exact language. This in itself tends strongly to negative the use of ordinary care in keeping a lookout to the rear. The jury might have found, if properly instructed, that the plaintiff was not using due care in keeping such a lookout. In fact, the majority's reasoning has the practical effect of negativing the necessity for a lookout or any issue made or instruction given concerning it. I am unable to believe that a driver who is under a ·duty to use ordinary care in keeping a lookout to the rear is relieved from that duty for no better reason than that he has given a signal of his intention to stop his vehicle, without using his rear-vision mirror or making any other attempt to observe what the situation behind his vehicle might be. The plaintiff had the burden to prove his freedom from contributory negligence. Under the circumstances here the jury might well have found that he owed the lookout duty above defined, and that he had failed to show that he had discharged it.

It is noteworthy that the appellee does not argue the point made by the majority, that although there was a duty to use ordinary care in keeping a lookout to the rear, and there is no evidence of the discharge of such duty, the failure to instruct thereupon is excused by the supposed fact that the plaintiff did all that he could have done by giving a signal of intention to stop. The appellee's contention is that there is no such duty to keep a watch to the rear. The majority concedes there is such a duty.

Both the questions discussed in Divisions I and II of this dissent were called to the attention of the trial court in several ways. It was error to fail to instruct upon them. This is elementary, but see Dakovich v. City of Des Moines, 241 Iowa 703, 710, 711, 42 N.W.2d 511, 515.

1032

I would reverse because of the failure of the court to instruct upon the plaintiff's duty under section 321.354 and to keep a proper lookout.

BLISS, C. J., and GARFIELD and OLIVER, JJ., join in this dissent.